IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee,*

*v.*

ANTHONY LEWIS,
*Appellant.*

No. 2 CA-CR 2013-0323
Filed December 10, 2014

---

Appeal from the Superior Court in Pima County
No. CR20090879001
The Honorable Deborah Bernini, Judge

## AFFIRMED AS MODIFIED

---

COUNSEL

Thomas C. Horne, Arizona Attorney General
Joseph T. Maziarz, Section Chief Counsel, Phoenix
By Eliza C. Ybarra, Assistant Attorney General, Phoenix
*Counsel for Appellee*

Lori J. Lefferts, Pima County Public Defender
By David J. Euchner and Erin K. Sutherland,
Assistant Public Defenders, Tucson
*Counsel for Appellant*

## OPINION

Judge Howard authored the opinion of the Court, in which Presiding Judge Kelly and Judge Vásquez concurred.

H O W A R D, Judge:

**¶1**        After a jury trial, appellant Anthony Lewis was convicted of one count of first-degree murder, two counts of aggravated assault, and one count of second-degree burglary. On appeal, Lewis argues the trial court erroneously found him competent to stand trial and erred in its instructions to the jury on his first-degree murder charge. For the following reasons and those expressed in a separate memorandum decision, we affirm the convictions and sentences, except as stated in the memorandum decision.[1]

### Factual and Procedural Background

**¶2**        We view the record in the light most favorable to upholding the jury's verdicts. *State v. Robles*, 213 Ariz. 268, ¶ 2, 141 P.3d 748, 750 (App. 2006). Lewis and the victim, A.H., had lived together in Tucson near the end of 2007 and beginning of 2008. After an altercation between the two in January 2008, A.H. obtained an injunction against harassment by Lewis, which he violated later that month. A.H. subsequently moved to a different home, miles from where she had lived with Lewis.

**¶3**        At some point, Lewis learned of A.H.'s new address. On September 21, A.H. returned home from a camping trip and discovered that Lewis had broken into her home while she was away. She also discovered a voicemail message from Lewis in

---

[1]Lewis raises other issues related to sentencing that do not meet the criteria for publication. *See* Ariz. R. Sup. Ct. 111(b). We address them in a separate, contemporaneously filed memorandum decision. *See* Ariz. R. Sup. Ct. 111(h); Ariz. R. Crim. P. 31.26.

which he said, "[Y]ou'll never guess where I am. I'm inside your house. Oh, what's that? What's this over here?" A.H. called 9-1-1 to report the break-in. When the police arrived, they found Lewis in A.H.'s yard. The police arrested him, and, following his initial appearance that same day, the justice court released him with an instruction not to return to A.H.'s residence.

¶4        The next day, September 22, Lewis returned to A.H.'s home, poured gasoline or some other kind of accelerant on her, and lit her on fire. A.H., naked and on fire, ran next door to her neighbor's house; the neighbor placed her under running water in his shower and called 9-1-1. A.H. identified Lewis as her assailant when officers arrived at the neighbor's home. Five months after the incident, A.H. died from complications related to her extensive burns.

¶5        The grand jury indicted Lewis on one count of first-degree murder, two counts of aggravated assault, and one count of first-degree burglary for the events that occurred on September 22. It also indicted him on one count of second-degree burglary for the break-in discovered on September 21. The jury found Lewis guilty of all but the first-degree burglary charge. The trial court sentenced him to an aggravated prison term of seven years for his second-degree burglary conviction, two aggravated terms of fifteen years for the assault convictions, both of which were to be served consecutively to the burglary sentence and to each other, and to natural life in prison on the first-degree murder charge, to be served concurrently with the sentences for aggravated assault.[2] We have jurisdiction over his appeal pursuant to A.R.S. §§ 12-120.21(A)(1) and 13-4033(A)(1).

---

[2]The sentencing minute entry states Lewis waived his right to a jury trial and pled guilty. But the record is clear that Lewis was tried by a jury, and during the oral pronouncement of sentence, the court correctly stated Lewis had been found guilty of the charges by a jury.

## Competency to Stand Trial

**¶6**     Lewis argues the trial court abused its discretion in finding him competent to stand trial without any evidence demonstrating successful restoration despite previously determining him to be incompetent.

**¶7**     After Lewis filed a motion pursuant to Rule 11.2, Ariz. R. Crim. P., the court ordered an examination of his competence and subsequently found him not competent to stand trial and ordered restoration treatment.  After two attempts at restoration and further hearings, the court ultimately found Lewis competent.

**¶8**     We review the trial court's competency determinations for abuse of discretion.  *State v. Glassel*, 211 Ariz. 33, ¶ 27, 116 P.3d 1193, 1204 (2005).  We do not reweigh the evidence.  *State v. Arnoldi*, 176 Ariz. 236, 239, 860 P.2d 503, 506 (App. 1993), *overruled on other grounds by State v. Jones*, 235 Ariz. 501, ¶ 10, 334 P.3d 191, 193 (2014).  Instead, "[w]e must determine whether reasonable evidence supports the trial court's finding that the defendant was competent, considering the facts in the light most favorable to sustaining the trial court's findings."  *Glassel*, 211 Ariz. 33, ¶ 27, 116 P.3d at 1204.

**¶9**     Competency is an "extremely narrow issue" focused on the test articulated by Rule 11.1, Ariz. R. Crim. P.  *See State v. Steelman*, 120 Ariz. 301, 315, 585 P.2d 1213, 1227 (1978).  A defendant is incompetent to stand trial when, "as a result of mental illness, defect, or disability, the person is unable to understand the proceedings against him or her or to assist in his or her own defense."  Ariz. R. Crim. P. 11.1; *see also* A.R.S. § 13-4501(2).  The fact that a defendant suffers from a mental illness, defect, or disability is not, by itself, grounds for finding the defendant incompetent.  § 13-4501(2); Ariz. R. Crim. P. 11.1.  Thus, a defendant found to have an intellectual disability is "not shielded from trial" automatically.  *State v. Grell*, 212 Ariz. 516, ¶ 38, 135 P.3d 696, 705 (2006).

**¶10**     If the trial court finds the defendant incompetent, the court "shall order competency restoration treatment unless there is clear and convincing evidence that [the] defendant will not regain

competency within 15 months." Ariz. R. Crim. P. 11.5(b)(3). The initial determination of incompetence raises a rebuttable presumption of continued incompetence. *State v. Hehman*, 110 Ariz. 459, 460, 520 P.2d 507, 508 (1974); *State v. Blazak*, 110 Ariz. 202, 204, 516 P.2d 575, 577 (1973). Nevertheless restoration treatment most often results in restoration to competence or a discovery the defendant had been malingering. *Grell*, 212 Ariz. 516, ¶ 39, 135 P.3d at 705.

¶11 Lewis argues that, after finding a defendant incompetent, a trial court cannot find the defendant competent unless "a positive change in condition [is] presented, and there [is] evidence presented that the restoration efforts were successful." He relies on the following language quoted in *Nowell v. Rees*:

> "For competency to be restored or regained there must be a positive change in the defendant's condition indicating that he is now able to understand the proceedings against him and assist his own defense, whereas he could not previously do so. It is not enough for a new expert to disagree with the previous determination. A new expert must be able to explain that restoration efforts were effective, and the trial court must make findings to that effect."

219 Ariz. 399, ¶ 4, 199 P.3d 654, 657 (App. 2008), *quoting Nowell v. Hintze*, No. 1 CA-SA 06-0236, 3 (decision order filed Mar. 22, 2007).

¶12 Lewis's reliance on *Nowell* for this proposition is misplaced. The statement relied on is a quote from an unpublished decision, was dictum as to the published opinion in *Nowell*, and did not create binding precedent. *See Creach v. Angulo*, 186 Ariz. 548, 552, 925 P.2d 689, 693 (App. 1996); *see also* Ariz. R. Sup. Ct. 111(c); Ariz. R. Crim. P. 31.24. The issue decided in *Nowell* was whether the trial court had authority to order competency restoration treatment for more than twenty-one months after an initial finding of incompetence. 219 Ariz. 399, ¶¶ 12, 27-28, 199 P.3d at 659, 662. This

court's opinion did not concern the evidence necessary to overcome the presumption of continued incompetence, and the court "may not have been fully advised on the question." *Creach*, 186 Ariz. at 552, 925 P.3d at 693.

**¶13** Further, *Nowell* does not address whether the subsequent discovery that a defendant had been malingering will overcome this presumption. *See* 219 Ariz. 399, ¶¶ 12-27, 199 P.3d at 659-62. And Lewis does not cite to any Arizona case suggesting a subsequent discovery of malingering is not sufficient to overcome this burden.[3] Nor does he explain how the state could show a malingering defendant has been restored to competence when the defendant does not, in reality, lack the competence to stand trial. Accordingly, we reject Lewis's contention that a positive change in a defendant's condition and successful restoration is always required before a trial court can find competent a defendant previously found incompetent.

**¶14** We accept, however, the premise that the trial court cannot make a subsequent finding of competence unless some new evidence—either of restoration or malingering—is presented to rebut the presumption of continued incompetence. But, as with other rebuttable presumptions, the presumption of continued incompetence "disappears entirely upon the introduction of any contradicting evidence and when such evidence is introduced the existence or non-existence of the presumed [incompetence] is to be determined exactly as if no presumption had ever been operative." *Sheehan v. Pima County*, 135 Ariz. 235, 238, 660 P.2d 486, 489 (App. 1982); *cf. State v. Grilz*, 136 Ariz. 450, 455, 666 P.2d 1059, 1064 (1983) (presumption of sanity "vanishes once [defendant] presents sufficient evidence to raise a reasonable doubt as to sanity"). Thus, evidence demonstrating the defendant is competent or invalidating

---

[3]In fact, in describing the competency restoration process, the Arizona Supreme Court has suggested that the discovery of malingering will overcome this presumption. *Grell*, 212 Ariz. 516, ¶ 39, 135 P.3d at 705 (noting that, in event of either restoration to competence or discovery of malingering, defendant can be tried and punished).

the original determination of incompetence, such as evidence of malingering, will suffice to remove the presumption of continued incompetence. *Cf. State v. Arellano*, 213 Ariz. 474, ¶ 13, 143 P.3d 1015, 1018 (2006) (rebuttable presumption of intellectual disability[4] "vanishes" when state presents evidence intelligence quotient scores invalid or other evidence capital defendant not suffering from intellectual disability).

**¶15** At oral argument, Lewis asked this court to adopt a rule requiring the state to present clear and convincing evidence of competence to rebut the presumption. But our supreme court adopted a rebuttable presumption of continued incompetence. *State v. Bradley*, 102 Ariz. 482, 487, 433 P.3d 273, 278 (1967), *overruled on other grounds by State v. Harvill*, 106 Ariz. 386, 391, 476 P.2d 841, 846 (1970). Lewis's suggested heightened standard would contradict the general rule that a presumption vanishes with the introduction of "*any* contradicting evidence." *Sheehan*, 135 Ariz. at 238, 660 P.2d at 489 (emphasis added); *see also Seiler v. Whiting*, 52 Ariz. 542, 548, 84 P.2d 452, 454 (1938) (presumption exists "*in the absence of any evidence to the contrary*"). And we are not at liberty to ignore supreme court precedent. *Lear v. Fields*, 226 Ariz. 226, ¶ 17, 245 P.3d 911, 917 (App. 2011). Further, Lewis has not produced any compelling rationale that the state's burden should be increased to the clear and convincing standard. Thus we reject Lewis's proposed rule.[5] *See*

---

[4]Although *Arellano* uses the term "mental retardation," in 2011, the legislature amended the capital sentencing statutes to remove that term and replace it with "intellectual disability." 2011 Ariz. Sess. Laws, ch. 89, § 5.

[5]We recognize that, if the state bears the burden of proof on a defendant's incompetence once the trial court has ordered a Rule 11 examination pursuant to Rule 11.2, Ariz. R. Crim. P., this presumption provides little benefit to a defendant. Neither party briefed the burden issue, but we assume for purposes of this opinion that the state does bear the burden of proof. *See State v. Romers*, 159 Ariz. 271, 274, 766 P.2d 623, 626 (App. 1988) (noting in dictum that state bears burden). We note that neither Rule 11.5, Ariz. R. Crim. P., nor A.R.S. § 13-4510 allocate the burden of proof. Because we conclude the court's competency determination here "did not

*Golonka v. Gen. Motors Corp.*, 204 Ariz. 575, ¶ 50, 65 P.3d 956, 971 (App. 2003) (adhering to general rules for rebuttable presumptions where neither substantive common law nor statute creating presumption compels otherwise).

**¶16**        Here, the record shows contrary evidence sufficient to rebut the presumption of continued incompetence, and reasonable evidence supports the trial court's finding that Lewis was competent to stand trial. *See Glassel*, 211 Ariz. 33, ¶ 27, 116 P.3d at 1204.

**¶17**        After four months of treatment and observation, Dr. Joseph, a forensic psychologist at the Pima County Restoration to Competency Program ("RTC"), submitted her final report concluding that Lewis had been malingering symptoms to exaggerate the severity of his intellectual deficiencies and that he was competent to stand trial. Joseph relied "on tests of effort, motivation, and malingering" that indicated Lewis had been trying to appear mentally ill by exaggerating or feigning symptoms. Joseph further noted that Lewis's behavior during interviews, his telephone calls and medical requests while in custody, his demonstrated ability to maintain employment, his educational history, and observations of his behavior while in custody—including a video of Lewis playing chess with another inmate—were inconsistent with the extent of his poor performance on psychiatric and cognitive tests. With this evidence before it, the court found Lewis incompetent but still restorable, believing that restoration treatment had been terminated prematurely.[6]

---

depend upon the allocation of the burden of proof," we do not decide the issue. *United States v. Whittington*, 586 F.3d 613, 617-18 (8th Cir. 2009) (noting federal statute on competency does not allocate burden of proof and circuit courts split on the issue).

[6]We reject Lewis's suggestion that the trial court "rejected" Joseph's report by finding Lewis incompetent. Nothing in the minute entries containing those rulings shows the court determined it would not give any weight to Joseph's opinion.

¶18        After nearly seven months of additional treatment and observation, Dr. Christiansen, restoration supervisor and forensic psychologist at the RTC, also concluded that Lewis had been malingering and that he was competent to stand trial. Christiansen's report and his testimony were the only new evidence submitted to the trial court for the last contested competency hearing, the only new evidence upon which the trial court based its ultimate determination that Lewis was competent.[7]

¶19        Lewis contends that Christiansen's final opinion was insufficient to overcome the presumption of continued incompetence because it did nothing more than disagree with the previous findings of incompetence and relied on much of the same evidence on which Joseph had relied without further formal testing. But these contentions are contradicted by the record.

¶20        Christiansen reviewed Joseph's assessment and much of the same data concerning Lewis's behavior and history, yet he also reviewed information gathered during the second attempt at restoration. Psychiatric providers reported to Christiansen that Lewis could not recall information he previously had been able to recall in other interviews, unless the information asked about would support a diagnosis of psychiatric disorder and thereby benefit him. One provider reported that Lewis said he did not want to do anything that would assist restoration treatment, and Lewis told a social worker that another inmate and a guard told him not to talk to RTC personnel. And his behavior with social workers and other inmates at RTC showed few signs, if any, of mood or psychotic disorders.

¶21        Additionally while Lewis continued to deny the details of his own case, he was able to remember and relay details of his cellmate's legal proceedings and of a Texas criminal case in which a

_____

[7]We note that a trial court is also allowed to rely on its own observations of a defendant when determining competence. *Glassel*, 211 Ariz. 33, ¶ 28, 116 P.3d at 1204. But the record here does not suggest that the court's direct observations were a factor in the ultimate determination of Lewis's competence.

man had been exonerated for murder after twenty-five years in prison. At one point, he commented to a social worker about his own case, saying in reference to the prosecution, "It's about what they can prove." During Christiansen's approximate total of four hours meeting face-to-face with Lewis, Christiansen personally observed that Lewis, despite his initial refusals to talk and denial of understanding, eventually betrayed a greater understanding of his case and the role of the RTC than what he initially portrayed.

¶22        Christiansen's opinion did not rely exclusively on old information. Rather, he formed his opinion relying, in part, on new evidence gathered during nearly seven months of further restoration treatment. Consequently, the trial court was entitled to rely on Christiansen's opinion as new evidence of malingering sufficient to rebut the presumption of continued incompetence.

¶23        Lewis also contends that Christiansen did not dispute evidence of Lewis's low intelligence quotient, which suggested he had a mild intellectual disability. But again, intellectual disability, by itself, is not incompetence. *See Grell*, 212 Ariz. 516, ¶ 38, 135 P.3d at 705. We find nothing improper in the trial court's reliance on his opinion.

¶24        Through Christiansen's report and testimony, the state adequately rebutted any presumption of continued incompetence. And before making its ultimate ruling, the trial court reviewed Lewis's entire competency file, including all expert opinions submitted on the issue, and made its determination by applying the proper Rule 11.1 standard. Thus the court did not abuse its discretion in determining Lewis was competent to stand trial. *See Glassel*, 211 Ariz. 33, ¶ 27, 116 P.3d at 1204.

## Jury Instructions on Predicate Offense

¶25        Lewis also argues his conviction for first-degree murder must be vacated because the trial court erred in instructing the jury on third-degree burglary as the predicate offense for felony murder, and because insufficient evidence supports the jury's finding that Lewis had committed this offense. Our analysis of the instructional error disposes of the challenge to the sufficiency of the evidence.

**"Fenced Commercial or Residential Yard"**

¶26      Lewis argues the trial court erred by failing to instruct the jury that it was required to find he had entered a "fenced residential yard" in order to be guilty of third-degree burglary. We review de novo whether jury instructions properly state the law. *State v. Orendain*, 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997). We also review issues involving the interpretation of a statute de novo. *State v. Magnum*, 214 Ariz. 165, ¶ 6, 150 P.3d 252, 254 (App. 2007).

¶27      Lewis was charged with first-degree murder and first-degree burglary in connection with the events of September 22. On the last day of trial, the state asked the trial court to instruct the jury on third-degree burglary as a predicate offense for felony murder. Lewis objected, contending he had no notice of that charge and that third-degree burglary requires entry of a fenced residential yard, rather than just any residential yard.

¶28      Over Lewis's objection, the trial court gave the third-degree burglary instruction. The court instructed the jury as follows:

> For the limited purpose of determining whether the state has proven the underlying offense of burglary for purposes of felony murder, you may also consider whether the defendant entered or remained unlawfully in a residential yard, and did so with the intent to commit any felony therein. That would constitute a form of burglary that would support a charge of felony murder.

¶29      The jury found Lewis guilty of first-degree murder, specifying in the verdict form its unanimous determination of guilt based on the felony-murder theory; it also unanimously rejected the premeditation theory. The jury acquitted Lewis of first-degree burglary and the lesser-included offense of second-degree burglary related to the events on September 22.

¶30         On appeal, Lewis argues the jury's rejection of the premeditation theory and the acquittal on the September 22 burglary charge indicate that it must have found him guilty of felony murder based on the predicate offense of third-degree burglary. Thus, he contends, the felony-murder conviction rests on a predicate offense for which the jury received an erroneous instruction.[8]

¶31         Section 13-1506(A)(1), A.R.S., defines third-degree burglary as "[e]ntering or remaining unlawfully in or on a nonresidential structure or in a fenced commercial or residential yard with the intent to commit any theft or felony therein." The parties disagree as to whether "fenced" modifies both commercial yard and residential yard, or if it modifies commercial yard only. And it appears that no other court has addressed the issue directly. *See State v. Johnson*, 215 Ariz. 28, ¶ 17, 156 P.3d 445, 449 (App. 2007) (referring to burglary in dictum as entrance into a "residential yard"); *see also State v. McKeon*, 201 Ariz. 571, ¶ 30, 38 P.3d 1236, 1242 (App. 2002) (referring to burglary in dictum as entering or remaining in "a fenced residential yard"); *State v. Bass*, 184 Ariz. 543, 546, 911 P.2d 549, 552 (App. 1995) (referring to third-degree burglary in dictum as concerning a "residential yard").

---

[8]The state argues Lewis's assumption that third-degree burglary was the predicate offense for the jury's guilty verdict on a felony-murder theory is incorrect because inconsistent verdicts are allowed in Arizona and the jury may have "based its felony murder conviction on first or second degree burglary, but still chosen not to convict on either burglary charge because of compromise or leniency." The verdict form did not ask the jury to specify the predicate offense that was the basis for the guilty verdict; the jury could have based the verdict on third-degree burglary. Even if we accept the state's argument, we nevertheless must decide whether third-degree burglary may be a predicate offense for felony murder because we will reverse a conviction that "may have been based, in whole or in part, on [an] impermissible felony murder theory." *See State v. Lopez*, 158 Ariz. 258, 266, 762 P.2d 545, 553 (1988) (reversing conviction potentially based on felony-murder theory for which record showed insufficient evidence to convict).

¶32          "Our task in interpreting the meaning of a statute is to fulfill the intent of the legislature that wrote it." *State v. Williams*, 175 Ariz. 98, 100, 854 P.2d 131, 133 (1993).  "In determining the legislature's intent, we initially look to the language of the statute itself." *Bilke v. State*, 206 Ariz. 462, ¶ 11, 80 P.3d 269, 271 (2003).  If the statute's language is clear, we apply it "unless application of the plain meaning would lead to impossible or absurd results." *Id.*  "If a statute is ambiguous, we consider 'the statute's context, subject matter, historical background, effects and consequences, and spirit and purpose.'"  *State v. Filkes*, 228 Ariz. 389, ¶ 6, 267 P.3d 1181, 1182-83 (App. 2011), *quoting Zamora v. Reinstein*, 185 Ariz. 272, 275, 915 P.2d 1227, 1230 (1996).  Where no contrary legislative intent appears from the statute's language or context, we may utilize grammatical rules to aid our construction of an ambiguous statute. *See Pawn 1st, L.L.C. v. City of Phoenix*, 231 Ariz. 309, ¶¶ 16, 19, 294 P.3d 147, 149-50 (App. 2013).

¶33          The cases cited above demonstrate, albeit in dicta, the language in § 13-1506(A)(1) could support either interpretation.  It could mean a fenced commercial or any residential yard, or a fenced commercial or fenced residential yard.  Accordingly, we conclude the statute is ambiguous, and we must apply rules of statutory construction to determine its meaning.  *See Filkes*, 228 Ariz. 389, ¶ 6, 267 P.3d at 1182-83.

¶34          We first look to the statute's context and surrounding sections.  *See id.*  "[O]ur statutory scheme . . . sets forth no less than three levels each of burglary and trespass . . . ." *State v. Hinden*, 224 Ariz. 508, ¶ 13, 233 P.3d 621, 624 (App. 2010); *see* A.R.S. §§ 13-1502 through 13-1504 (trespass); A.R.S. §§ 13-1506 through 13-1508 (burglary).  In the statute defining first-degree criminal trespass, the legislature explicitly distinguished between fenced residential yards and all residential yards by using the phrases, "fenced residential yard" and "*any* residential yard" to distinguish between different criminal acts.  § 13-1504(A)(2), (3) (emphasis added).  Thus, when the legislature has intended to criminalize an act committed in both fenced and unfenced residential yards in this statutory scheme, it has done so explicitly and unambiguously.  *Cf. State v. Peek*, 219 Ariz. 182, ¶ 19, 195 P.3d 641, 644 (2008) ("When the legislature intends to include attempts, it knows how to do so.").

¶35 We next apply grammatical rules to aid in our construction. *See Pawn 1st*, 231 Ariz. 309, ¶ 19, 294 P.3d at 150. One general rule of syntax is that "'an initial modifier will tend to govern all elements in the series unless it is repeated for each element.'" *Cady v. Schroll*, 317 P.3d 90, 96 (Kan. 2014), *quoting Wash. Educ. Ass'n v. Nat'l Right to Work Legal Def. Found., Inc.*, 187 Fed. App'x 681, 682 (9th Cir. 2006). Courts will employ this rule when its application does not conflict with other principles of statutory construction. *See, e.g., Cady*, 317 P.3d at 96-99 (noting rule but finding it inapplicable to phrase "vicarious liability or responsibility," in part because its application would render word "responsibility" meaningless); *see also Long v. United States*, 199 F.2d 717, 719 (4th Cir. 1952) ("forcibly" modifies all verbs in phrase "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with"); *State v. Huggins*, 802 So. 2d 276, 277-79 (Fla. 2001) ("occupied" modifies both nouns in phrase "occupied structure or dwelling" in burglary statute); *Rounsavell v. Tipton*, 497 P.2d 108, 109 (Kan. 1972) ("restricted" modifies both registered mail and certified mail in phrase "restricted registered or certified mail"); *Wash.-Va. Ry. Co. v. Fisher*, 92 S.E. 809, 811 (Va. 1917) ("county" modifies both nouns in phrase "county roads or highways").

¶36 Applying this rule of syntax, "fenced" modifies both "commercial yard" and "residential yard" in the phrase "fenced commercial or residential yard." *See Rounsavell*, 497 P.2d at 109. This construction gives effect to each of the words in the phrase and does not conflict with other principles of statutory interpretation. *See Cady*, 317 P.3d at 96. Further, nothing in the language or context of § 13-1506 suggests that this construction conflicts with the legislative intent behind the statute. *See Pawn 1st*, 231 Ariz. 309, ¶ 19, 294 P.3d at 150.

¶37 We conclude that "fenced commercial or residential yard" in § 13-1506 refers to fenced commercial or fenced residential yards, and it does not include unfenced residential yards. Thus the trial court erred in instructing the jury on third-degree burglary in this case. *See State v. Moody*, 208 Ariz. 424, ¶ 191, 94 P.3d 1119, 1161 (2004) (instruction that misstates law is error).

¶38      "Erroneous jury instructions are subject to a harmless error analysis." *State v. Dann*, 205 Ariz. 557, ¶ 18, 74 P.3d 231, 239 (2003). "An error is harmless if it appears 'beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained.'" *Id.*, *quoting Chapman v. California*, 386 U.S. 18, 24 (1967). If a rational jury could find that the element omitted from the jury instructions had not been established beyond a reasonable doubt, then the error is not harmless. *Id.* The state has the burden of establishing that the error is harmless. *State v. Henderson*, 210 Ariz. 561, ¶ 18, 115 P.3d 601, 607 (2005).

¶39      The state has met this burden by relying on evidence in the record showing no rational jury could have had a reasonable doubt A.H.'s yard was fenced. A "fenced residential yard" is "a unit of real property that immediately surrounds or is adjacent to a residential structure and that is enclosed by a fence, wall, building or similar barrier or combination of fences, walls, buildings or similar barriers." A.R.S. § 13-1501(5). The photographs of A.H.'s property in the record clearly show that her backyard was enclosed by a combination of fences, gates, bushes, and trees forming a barrier. Witnesses familiar with A.H.'s yard also described a combination of fences, gates, bushes, and foliage separating A.H.'s yard from her neighbors' yards and her back alley.

¶40      Nevertheless, Lewis argues that a gate on one side of the house "does not seem to connect to anything," but the photographs cited by Lewis in support for this claim show otherwise. Consequently, this argument is unavailing.

¶41      Lewis further contends that "[t]he evidence presented at . . . trial does not permit a finding that the residential yard was 'fenced'" because it was not "enclosed" as required by the definition of "fenced residential yard" in § 13-1501(5). Lewis supports this contention by alleging, with little supporting evidence, that the gates to the yard were "rarely if ever closed" or were "propped open." He cites testimony that one of the fences was "really ratty, really half broken down." Lewis further alleges that one side of the house has "no fence or gate at all" but only shrubbery.

¶42        But the existence of a barrier, not its quality, is what the fact-finder must determine to decide whether a yard is "enclosed" under § 13-1501(5).   Lewis cites no authority to support his restrictive reading of § 13-1501(5).   "Absent statutory definitions, courts apply common meanings and may look to dictionaries." *State v. Pena*, 235 Ariz. 277, ¶ 6, 331 P.3d 412, 414 (2014) (internal citation omitted).   The relevant dictionary definitions of "enclose" are "[t]o surround on all sides; close in" and "[t]o fence in so as to prevent common use." *The American Heritage Dictionary* 587 (5th ed. 2011). Nothing in this definition suggests that a yard must be impenetrable to be enclosed, and we see no reason that an open gate or a "ratty" fence would make a residential yard any less "enclosed."   The fence was sufficient to prevent common use of the back yard.   As to Lewis's shrubbery concern, the definition of "fenced residential yard" includes yards that are enclosed with barriers other than fences.   *See* § 13-1501(5) ("fence, wall, building, or similar barrier"). Consequently, we decline to adopt Lewis's restrictive interpretation of "fenced residential yard."

¶43        For the foregoing reasons, we find that the error in the jury instruction was harmless, and we will not disturb the jury's first-degree murder verdict on these grounds.   *See Dann*, 205 Ariz. 557, ¶ 18, 74 P.3d at 239.

**Requested Criminal Trespass Instruction**

¶44        Lewis further argues the trial court committed reversible error in refusing to give the jury his requested instruction on criminal trespass as a "theory of the case."   We review a court's refusal to give a requested jury instruction for an abuse of discretion. *State v. Dann*, 220 Ariz. 351, ¶ 51, 207 P.3d 604, 616-17 (2009).   A party is not entitled to an instruction on a theory of the case unless the evidence reasonably supports it.   *State v. Bolton*, 182 Ariz. 290, 309, 896 P.2d 830, 849 (1995).   The failure to give an instruction that is reasonably supported by the evidence is reviewed for harmless error.   *State v. Rodriguez*, 192 Ariz. 58, ¶ 27, 961 P.2d 1006, 1011 (1998).

¶45        After the trial court agreed to give the state's instruction on third-degree burglary, Lewis asked for an instruction on criminal

trespass, both as a lesser-included offense of first-degree burglary and as a "theory of the case." The court refused to give the instruction as a lesser-included offense and as a "theory of the case," stating, "I don't think I can give a theory of the case that's contrary to appellate case law or that in any way would confuse the jury as to what the law actually is."

¶46 "A defendant is not entitled to an instruction on an uncharged offense that does not qualify as a lesser-included offense, even if he might have been charged and convicted of the offense." *State v. Gonzalez*, 221 Ariz. 82, ¶ 8, 210 P.3d 1253, 1255 (App. 2009). And characterizing the uncharged offense as a "theory of the case" does not entitle the defendant to an instruction. *See State v. Keel*, 137 Ariz. 532, 534, 672 P.2d 197, 199 (App. 1983); *see also State v. Teran*, 130 Ariz. 277, 279, 635 P.2d 870, 872 (App. 1981).

¶47 In *Teran*, the defendant appealed his conviction for theft on the ground that the trial court had denied his request for an instruction and verdict form on shoplifting. 130 Ariz. at 278, 635 P.2d at 871. Even though shoplifting was not a lesser-included offense of theft, the defendant argued that the instruction should have been given as a "theory of the case" instruction because "he should [have been] entitled to have the jury decide between the two offenses." *Id.* We rejected this argument because "a finding that [defendant] was guilty of shoplifting would not mean that he was innocent of the theft charge." *Id.* In *Keel*, we rejected a "theory of the case" argument when a defendant claimed he was entitled to a criminal trespass instruction during trial on a charge of attempted theft. 137 Ariz. at 534, 672 P.2d at 199. We noted that "a finding that [defendant] was guilty of trespass would not mean he could not be guilty of attempted theft." *Id.*

¶48 In this case, the trial court did not abuse its discretion in refusing the requested instruction. Criminal trespass is not a lesser-included offense of burglary, *State v. Kozan*, 146 Ariz. 427, 428-29, 706 P.2d 753, 754-55 (App. 1985), and Lewis was not entitled to an instruction on it so that the jury could choose to find he committed a less serious crime if it was doubtful about felonious intent, *see Gonzalez*, 221 Ariz. 82, ¶ 8, 210 P.3d at 1255.

¶49 Nor was criminal trespass a "theory of the case" because a finding of criminal trespass by the jury would not have meant that Lewis was not guilty of third-degree burglary. *See Keel*, 137 Ariz. at 534, 672 P.2d at 199; *see also Teran*, 130 Ariz. at 278, 635 P.2d at 871. His theory of the case was simply that he was not guilty of burglary, and the absence of a criminal trespass instruction did not affect that argument. Further, the jury had been properly instructed on the felonious intent element of burglary, and an instruction on criminal trespass would have, if anything, "do[ne] nothing more than reiterate[d] or enlarge[d] the instructions in defendant's language." *See Bolton*, 182 Ariz. at 309, 896 P.2d at 849. The trial court properly refused Lewis's proposed criminal trespass instruction, and we uphold the first-degree murder conviction.

## Disposition

¶50 Based on the foregoing, we affirm Lewis's convictions on all counts and his sentences on first-degree murder in count one, aggravated assault in count three, and second-degree burglary in count five. For the reasons discussed in the contemporaneously filed, separate memorandum decision, we modify Lewis's sentence for aggravated assault in count two to be served concurrently with the sentence for aggravated assault in count three.